PENNSYLVANIA OIL PRODUCTS REFINING COMPANY, Appellant, *v.* WILLROCK PRODUCING COMPANY, INC., et al., Defendants, and FIRST NATIONAL BANK OF OLEAN, NEW YORK, Respondent.

428

(Argued April 22, 1935; decided May 21, 1935.)

*Austin W. Erwin* for appellant.

*Earl C. Vedder* for respondent.

FINCH, J.  The complaint is in the usual form to foreclose a real estate mortgage, given to plaintiff by defendant Willrock Producing Company, Inc., for $100,000. Defendant First National Bank of Olean was not named as a party but became such upon its own application. Defendant Willrock Producing Company defaulted in appearing and answering.  Defendants Williams served

answers alleging affirmative defenses, which were dismissed upon the trial, and no appeal was taken.

The defendant First National Bank of Olean, after denying any knowledge or information sufficient to form a belief as to various material allegations of the complaint, set up an affirmative defense and counterclaim alleging that the mortgage of plaintiff was made with the intention that it be subject to the right of the defendant bank to have run to its credit one-fourth of the oil produced on the premises described, and that through mutual mistake on the part of the defendants and the plaintiff, or mistake on the part of the defendants and fraud on the part of plaintiff, no provision was made in the mortgage in accordance with such intention. The relief asked for reformation of the mortgage by inserting therein the paragraph set forth in the answer. The trial of the cause in the County Court resulted in a judgment reforming the mortgage by inserting therein a new paragraph making the same subject and subordinate to the right of the defendant bank to receive one-fourth of the oil produced until the claim of the bank should be paid and satisfied.

Upon appeal by plaintiff to the Appellate Division the judgment was modified by denying reformation of the mortgage but adjudging an equitable lien superior to the mortgage in favor of the bank for the amount of the claim of the latter upon the oil in, under and upon the premises.

The facts, in brief, are as follows:

In 1926, defendants Walter E. Williams and his wife acquired certain oil lands in Cattaraugus county, giving back a purchase-money mortgage for $35,000 as part consideration for the property. They proceeded to develop the property for the production of oil. To obtain funds therefor they borrowed, from time to time, from the First National Bank of Olean an amount aggregating $24,000, giving in return their individual promissory notes, one of which pledged to the bank as collateral

security one-fourth of the oil produced. It recited that the makers have pledged to the bank "assignment oil runs (Vacuum No. 12)" as security for the indebtedness. At the same time, Mr. and Mrs. Williams and the bank executed the ordinary form of what is known as a transfer or division order of the Tidewater Pipe Company, Ltd., which was the company which purchased the oil produced from the property. This order directed that the purchasers of the oil pay to the bank one-fourth of the sale price of the oil run from the property. In 1930 the purchase-money mortgage had been reduced by payments to about $20,000 and notes remained unpaid also in the sum of about $20,000. At that time oil production had fallen to less than two barrels a day. Williams then entered into negotiations with the plaintiff, Pennsylvania Oil Products Refining Company, and an agreement was arranged between them, under the terms of which the plaintiff subsequently advanced $100,000 for the development of the lands; title to the property was conveyed to a new corporation, the Willrock Producing Company, Inc., organized by the parties; and the plaintiff received a second mortgage for the $100,000 loaned. The mortgage provided that the property was free and clear of all incumbrances except the lien of the first mortgage and that it should be subsequent only to the lien of the first mortgage.

The defendant's claim of the existence of an equitable mortgage or equitable lien in its favor to the extent of one-fourth of the oil is based upon conversations which occurred prior to the issuance of the mortgage to the plaintiff. The evidence as introduced by the defendant was that Williams during the course of negotiations had advised the plaintiff's officers that he owed the bank a sum in excess of $20,000 and that the bank held as collateral security for such indebtedness an assignment of one-fourth of the oil produced from the property. Plaintiff's officers requested Williams to make arrangements with

the bank for the continuance of the loans which would be assumed by the new corporation. The testimony on this subject is as follows:

" Q. Was there anything said at that time about the First National Bank of Olean?  A. We discussed in a general way all the obligations at that time.

" Q. Was there anything special?  A. And Mr. Cowden asked me if I felt the First National Bank would transfer that loan to the new company, would go along with the new company and I told him that Mr. Dusenbury would have to be consulted about that and he said, ' Will you see him? '

" Q. Yes.  A. He said, ' We don't want to go down in our jeans for twenty-three thousand dollars.'  So I agreed to see him.

" Q. He asked you at that time to see Mr. Dusenbury. Mr. Dusenbury is the president of the First National Bank?  A. Yes, sir.

" Q. And see what arrangement would be made by the bank?  A. See what they would do."

Shortly afterward, Williams saw the president of the bank and outlined to him the plaintiff's proposal and asked the bank's president if the bank would be willing to continue the Williams loan, held by it, and transfer the indebtedness to the new company when it should be formed.  He testified that the president of the bank replied that " We will be willing to go along if you run one-fourth of the oil to us until this obligation is cleaned up and let nothing get in ahead of it."  Williams' testimony then goes on as follows:

" Q. Then what did you do?  A. I told him that was our intention, which I felt was, it was my intention.

" Q. Just what you told him is all.  Later did you communicate that to Mr. Cowden?  A. I did.

" Q. That is, you told him what Mr. Dusenbury said? A. Exactly what Mr. Dusenbury said."

The negotiations prior to the execution of the written agreement and the $100,000 loan extended over a period of several months and during this time Williams kept the president of the bank fully informed of the progress made. In one of his conferences with the bank president he had a copy of the agreement with him and the latter had an opportunity to examine it, but his testimony is that he did not read the instrument.

The new company was formed and the bank extended the loan to it. The new note contained a provision similar to the one in the Williams note. It pledged to the bank as security one-fourth of the oil run from the property until the note should be fully satisfied.

Although the Willrock Company, up to the time of the foreclosure proceedings, turned over the proceeds arising from the sale of one-fourth of the oil run to the bank, no payments were made upon the principal or interest of the first mortgage. Eventually this action of foreclosure was instituted. Thereupon the defendant applied to be joined as a party and when this was done asked to have the mortgage reformed by inserting the following paragraph:

" *It is understood and agreed* that there is now existing and outstanding an instrument in writing, by the terms of which The First National Bank of Olean, N. Y., is entitled to receive and to have run to its credit with the pipe line company taking the oil from the premises above described one-fourth of said oil until there shall have been fully paid and satisfied a promissory note dated the 1st day of October, 1932, in the principal amount of $17,853.03, with interest thereon at six per cent per annum, made by the mortgagor Willrock Producing Company, Inc.; and that the above mortgage is taken by the mortgagee subject and subordinate to the right of The First National Bank of Olean, N. Y., to receive said one-fourth of said oil so produced on said premises until its said note has been fully paid and satisfied."

This relief was granted by the lower court. The Appellate Division modified, refusing to grant reformation but holding that the bank was entitled to an equitable lien " upon an undivided one-fourth of the oil in, under and upon the hereinafter described premises until the same shall be fully paid or satisfied, prior and superior to the lien of the mortgage from Willrock Producing Company, Inc., to Pennsylvania Oil Products Refining Company."

A comparison of the relief awarded to the defendant on the theory of an equitable lien with the allegations of the affirmative defense set up in the answer of the defendant bank shows a recovery upon a cause of action not alleged in the pleadings. The relief asked in the pleadings was reformation of the plaintiff's mortgage. Since, however, the defendant bank was not a party to the mortgage, obviously it could not obtain reformation of the mortgage on the ground of mutual mistake or mistake on one side and fraud on the other. Where it can be demonstrated that no injustice or damage resulted to the losing party through such a variance it may properly be disregarded. Here, however, the defendant bank relies upon oral conversations between the defendant Walter E. Williams and the president of the defendant bank. Assuming that such testimony was relevant, it did not relate to any issue in the pleadings nor was it material to the relief sought in the affirmative defense of the bank. Hence, the plaintiff is justified in urging that such testimony was not of sufficient materiality to require the bringing forward of all the proof which may have been available to contradict the testimony. The plaintiff had a right to rest upon its justifiable conclusion that in no event could a valid judgment of reformation be made of a mortgage to which the defendant bank did not even purport to be a party.

It may be pointed out that to find an equitable lien it is necessary that an intention to create such a charge

clearly appear from the language and the attendant circumstances. Strict proof of such intention is required. As was said in the case of *Di Niscia* v. *Olsey* (162 App. Div. 154, 155): " The respondent would maintain this judgment on the theory of equitable lien. The difficulty in the way of affirmance is that proof of a breach of the contract only does not warrant this decree of the equity court. There should also appear proof that clearly established the intention that the premises would ' be held, given or transferred as security for the obligation ' of the contract. (Pomeroy's Equity Jurisprudence [3d ed.], p. 1235; 19 Am. & Eng. Ency. of Law [2d ed.], 15; *Wright* v. *Ellison*, 1 Wall. 16.) "

To make such a lien binding upon a third party, it is necessary that its existence as a lien be fully proven. Whether the proof in the case at bar, in light of the surrounding circumstances, clearly shows an intent to create a charge or lien and that the plaintiff was aware of its existence as such at the time it took the mortgage are questions of fact to be determined by the trial court. We may add, however, that as the evidence appears on this record it is difficult to see how the defendant bank can establish an equitable lien in the oil to be run, which is personalty (as contrasted with oil under ground, which is realty) (1 Thornton on the Law of Oil and Gas [1932], § 50), so as to interfere with the rights of the plaintiff under the mortgage on the real estate. It is hard to spell out an agreement from the conversation between the defendant Williams and the president of the bank. The only part of the testimony which tends to support the claim that an equitable lien was created is Williams' statement that President Dusenbury said that he was willing to extend the loan if the right to one-fourth of the oil was continued and they " let nothing get in ahead of it " and Williams' testimony that he repeated this statement to the plaintiff. Meager as this evidence is, it will suffice if supported by the surrounding

circumstances. The circumstances, however, seem to furnish little aid. There was the remainder of the purchase money mortgage, namely, $20,000, which still remained unpaid; there was the $20,000 which Williams owed the bank on promissory notes secured by an assignment of one-fourth of the oil produced; the land was producing less than two barrels of oil a day. The defendants Williams were confronted with the imminent loss of their property and the defendant bank was faced with the probable loss of the money advanced for the development. It was then that the negotiations were commenced with the plaintiff, the plaintiff agreeing to expend $100,000 to assist in the rehabilitation of the oil wells. The arrangement described above was then made and the mortgage given to the plaintiff. Despite the fact that according to Williams' testimony he had just agreed with the defendant bank that nothing was to be let in ahead of its right to one-fourth of the oil, the written agreement between Williams and the plaintiff specifically provided that it was " free and clear of all encumbrances of every kind whatsoever, except the lien of said [first] mortgage." The bank president claims that although he kept in touch with all negotiations and had an opportunity to see the mortgage he did not read it. In addition, the bank wrote a letter to the plaintiff stating that, " We, of course, understand that we have no interest in the fee of the property and that our ownership is only ¼ of the oil that is run."

It follows that the judgment of the Appellate Division and that of the County Court should be reversed and a new trial granted, with costs to abide the event.

CRANE, Ch. J., LEHMAN and LOUGHRAN, JJ., concur; O'BRIEN, HUBBS and CROUCH, JJ., dissent.

Judgments reversed, etc.